**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| PUERTO RICO MEDICAL EMERGENCY GROUP, P.S.C. | CIVIL NO.: 14-1616 (FAB) |
| PLAINTIFF | VIOLATION OF THE RACKEETER INFLUENCED AND CORRUPT ORGANIZATION ACT; BREACH OF CONTRACT; UNJUST ENRICHMENT; FAILURE TO COMPLAY WITH IMPLIED COVENANT OF GOOD FAITH, TORTIOUS INTERERENCE; FRAUD; LIBEL AND TORT DAMAGES |
| V. | |
| IGLESIA EPISCOPAL PUERTORRIQUEÑA, INC; (**THE RICO DEFENDANT**) SAINT LUKES MEMORIAL HOSPITAL, INC.; DBA HOSPITAL SAN LUCAS; SERVICIOS DE SALUD EPISCOPALES, INC; SERVICIOS GENERALES EPISCOPALES, INC.; INSURANCE COMPANY ABC, DEF; ; JOHN DOE , JIM DOE,JANE DOE AND SUE DOE | PLAIINTIFF DEMANDS TRIAL BY JURY |
| DEFENDANTS | |

**THIRD AMENDED COMPLAINT**

TO THE HONORABLE COURT:

COMES NOW, the plaintiff, through its undersigned attorneys, and very respectfully states, alleges and prays:

**I.     NATURE OF ACTION**

1.1     This is an action for violation of the Racketeer, Influenced and Corrupt Organization Act; for breach of contract, for unjust enrichment, for failure to comply with the implied covenant of good faith, tortious interference; fraud, libel and tort damages.

1.2     The primary cause of action of this case is a long-term criminal enterprise engaged in a pattern of racketeering activity, involving numerous RICO predicate acts during the past seven (7) calendar years.

1.3    The RICO predicates alleged here cluster around mail fraud and wire fraud which in turn are directly related to further criminal conduct punishable as health care fraud; false claims; false statements; false statements in connections with the Social Security Act and theft and/or embezzlement in connection with health care; See: 18 U.S.C. §§ 287, 669, 1001, 1341, 1343, 1347; and 42 U.S.C. §132Oa-7b(a).

1.4    The Plaintiff requests from this Honorable Court compensation for its economic losses, including but not limited to the loss of billing due to Puerto Rico Medical Emergency Group, P.S.C. ("PRMEG") for its services under the contract with Saint Lukes Memorial Hospital, Inc.; dba Hospital Episcopal San Lucas[1] ("Saint Lukes Hospital"), the damages to its good name and reputation in the medical community which it served and the loss of multiple important contractual relationships with physicians who used to provide services to PRMEG.

## II.    VENUE AND JURISDICTION

2.1    Jurisdiction is conferred upon this Court by Title 28 U.S.C.A. § 1331 pursuant to this Honorable Court's federal question jurisdiction, insofar as plaintiff's claims against the RICO defendant arise under the Racketeer Influenced and Corrupt and Organization Act ("R.I.C.O."), particularly 18 U.S.C.A. §1962 (a)-(d), in its civil context pursuant to 18 U.S.C.A. §1964(c).  Supplemental Jurisdiction is also conferred by Title 28 U.S.C.A. §1367, insofar as all Puerto Rico law claims presented herein against the defendants who form part of the corrupt enterprise are so related to claims

---

[1]  This is one of the names under which Saint Lukes Memorial Hospital, Inc. did and continue to do business today.  Another name it used and still continues to use was Hospital San Lucas and Hospital San Lucas Ponce.

in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.2    Venue properly lies in this district since the claims and almost all of the operative facts occurred within the Commonwealth of Puerto Rico.

2.3    Pursuant to the Seventh Amendment to the United States Constitution, plaintiffs demand trial by jury as to all counts presented in the instant complaint.

### III.    THE PARTIES

3.1    Plaintiff PRMEG is a professional services corporation registered and authorized to do business in the Commonwealth of Puerto Rico with its main office located in Ponce, Puerto Rico.

3.2    RICO Defendant Iglesia Episcopal Puertorriqueña, Inc. ("Iglesia") is a non-for-profit corporation created and organized under the laws of the Commonwealth of Puerto Rico with its principal place of business and main offices located in Ponce, Puerto Rico.

3.3    RICO Enterprise and supplemental party Defendant, Saint Lukes Hospital, is a non-for-profit corporation, with Puerto Rico registry number 35522 created and organized under the laws of the Commonwealth of Puerto Rico with its principal place of business and main offices located in Ponce, Puerto Rico.

3.4    RICO Enterprise and supplemental party Defendant, Servicios de Salud Episcopales, Inc., ("Servicios de Salud"), is a non-for-profit corporation created and organized under the laws of the Commonwealth of Puerto Rico with its principal place of business and main offices located in Ponce, Puerto Rico.

3.5    RICO Enterprise and supplemental party Defendant, Servicios Generales Episcopales, Inc., ("Servicios Generales"), is a non-for-profit corporation created and organized under the laws of the Commonwealth of Puerto Rico with its principal place of business and main offices located in Ponce, Puerto Rico.

3.6    Codefendants John Doe and Jim Doe were at all times and acted in all matters complained hereafter as agents or employees of the corporate defendants and may be liable to plaintiff for their actions. While not defendants in the RICO claim, they are supplemental party defendants as to all other causes of action. All unknown named defendants will be substituted and served process as soon as their names are known.

3.7    Codefendants Jane Doe and Sue Doe are the wife of unknown named codefendants and as such are liable for their actions and/or omissions. The legal partnership constituted by them, are also liable to plaintiff for the actions and omissions of their spouses.  While not defendants in the RICO claim, they are supplemental party defendants as to all other causes of action.  All unknown named defendants will be substituted and served process as soon as their names are known.

3.8    Codefendants Insurance Company ABC and DEF are the insurance company for the corporate defendants and/or the individual defendants, who issued insurance coverage for the actions described in the complaint for which such insurance company is jointly and/or independently liable for the events described in the complaint.

**IV.    GENERAL FACTS**

**A.    The Contractual Background.**

4.1    Plaintiff PRMEG is a Puerto Rico corporation created to provide emergency room administration and treatment to patients in various hospitals within the Commonwealth of Puerto Rico.

4.2    Defendant corporations Saint Lukes Hospital and Servicios de Salud manage and administer several hospital facilities in the South of Puerto Rico, owned by RICO Defendant Iglesia, including but not limited to the Saint Lukes Hospital emergency room and El Tuque emergency room.  For years Saint Lukes Hospital maintained a contractual relationship with third parties to manage, administer and provide emergency medical care to patients visiting the Saint Lukes Hospital emergency room based on a fixed monthly lump sum.

4.3    As part of this type of contractual relationship, Saint Lukes Hospital retained Instituto de Emergencias Médicas, Inc. (hereafter "IEM") to manage and run the emergency rooms at Saint Lukes Hospital I and Saint Lukes Hospital II on December 1, 2002. (See:  Contract between Saint Lukes Hospital and Instituto de Emergencias Médicas, attached hereto as Exhibit 1 to the Second Amended Complaint).

4.4    Pursuant to the contract between Saint Lukes Hospital and IEM it was absolutely clear that Saint Lukes would pay IEM a lump sum payment in exchange for IEM ceding to Saint Lukes Hospital all rights over the professional and production component of the services rendered by IEM's contracted physicians who provided medical care to Saint Lukes Hospital's patients at its two emergency room facilities.

4.5    In this regard the contract between Saint Lukes Hospital and IEM reads at ¶12 as follows:  FEES FOR PROFESSIONAL SERVICE:  HESL will pay in a monthly

basis, and allow to the CORPORATION  by way of payments for its services at the Department, including the professional fees paid by the CORPORATION to its Contracted Physicians a total sum of TWO MILLIONS FIVE HUNDREDS AND FIFTY THOUSAND DOLLARS $2,550,000.00 payables in monthly installment of TWO HUNDRED TWELVE THOUSAND AND FIVE HUNDREDS ($212,500).  The charges for professional and production components of the fees for the services rendered at the Department shall be established, billed and collected by HESL. (See: Exhibit 1 at ¶12).

4.6    That Saint Lukes Hospital business strategy in 2002 was its direct billing to insurance companies of the services provided by IEM's physician is further supported by §9 of the contract between Saint Lukes Hospital and IEM that required IEM to "fully and promptly complete medical and administrative records as well as all other necessary/required documentation which are the responsibility of the physicians in accordance with the requirements of third-party payers (Humana, United Healthcare, Medicare, Blue Cross, SSS, etc.)."

4.7    The same contractual clause required IEM to indemnify Saint Lukes Hospital for any "payment that is denied or disallowed to [IEM's] failure to comply with [the obligations arising out of ¶9 of the contract].  As the contract stated "[s]uch indemnity shall include, but not limited to, the amount of reimbursement or payment denied or disallowed, plus interest at the highest prevailing rate permitted by law.

4.8    RICO Defendant Iglesia is by information and belief a non-for-profit religious organization that owns and controls the operation of the RICO enterprise in this case and who grossly profited from the sums generated by the scheme to defraud

put in place by the directors of Saint Lukes Hospital and Servicios de Salud for the benefit of Iglesia.

4.9     In fact, the RICO Enterprise operations constituted over 70% of the RICO Defendant income for the year 2014 and such income is expected to increase in 2015.

4.10    RICO Defendant Iglesia controls the operation of the RICO enterprise as the head of the church, by information and belief is the President of the Board of Directors for each of defendant RICO Enterprises.  The Board of Director for each of the corporations' members of the RICO Enterprise is controlled by members of RICO Defendant Iglesia. Thus, the RICO Defendant is the entity with control of any fundamental financial decision by the RICO enterprise, included the events alleged in the instant complaint.

4.11    By information and belief supported on prior sworn testimony and statements issued by then Saint Lukes Hospital Director, Javier E. Malavé-Rosario on or around a date prior to the September 2007 Saint Lukes Hospital directors determined to explore changing the business model relating to the operation of the emergency room facilities.  The then fixed sum, monthly payment model confronted the problem of requiring the hospital to completely cover the costs of the medical services provided at the emergency room and then attempt to recover such costs, plus any profit, from the insurance company that provided coverage for Saint Lukes Hospital's patients.

4.12    Mr. Malavé and others desired to alter such business model to transfer the risk of recovery to the contractual entity then running the emergency room.  In the new business plan, Saint Lukes Hospital would pay a reduced monthly payment as it recognized that 100% recovery for services was not realistic nor possible and in

exchange for accepting such reduced monthly rate it would cease billing insurance companies for the professional and production components of the fees for the services rendered at the emergency room.   Such components will be then billed by the contracted third party.

4.13   To viabilize this new business model Malavé contacted the then principal officers for IEM, by that time known as Caribbean Emergency Group, Inc. (hereafter "CEG"), who were adamant in their refusal to change the agreed fixed monthly fee based contract.

4.14   CEG was aware that to transform to a bill for service model it would had to assume the risk of recovery from insurance company, create or retain the necessary infrastructure to timely bill the insurance companies and thus modify their financial model that was based on a fixed cash flow model.

4.15   When IEM stalled in the consideration of the new business model desired by Saint Lukes Hospital, Malavé commenced to approach other potentially interested parties and as such approached the principals for PRMEG.

4.16   In all conversations with Malavé PRMEG principals were advised that the business model that the Saint Lukes Hospital desired was one that reduced the monthly lump sum payments for which in turn the third party providing emergency room services would bill for the professional component of the services provided to Saint Lukes Hospital patients.

4.17   PRMEG complied and offered to Saint Lukes Hospital its disposition to enter into the modified business model, thus accepting a severely reduced monthly rate compared to the $212,500 fixed monthly payment that IEM and later CEG received.

4.18    Having accepted the new business model promoted by Saint Lukes Hospital, PRMEG entered into a contract with Saint Lukes Hospital for the operation of the Emergency Department on September 25, 2007.

4.19    As will be explained in more detail hereafter, the contract, in good faith required Saint Lukes Hospital to take the necessary steps to amend its contractual relationship with all insurance companies to which heretofore Saint Lukes had represented it had the sole right to bill the professional and production components of the fees for the services rendered at the emergency room pursuant to the contract with IEM and CEG.

4.20    As will be explained in more detail hereafter, Saint Lukes Hospital failed to do so, after altering its business model in 2007, electing instead to continue to bill the professional and production components of the fees for the services rendered at the emergency room to insurance companies well knowing that by doing so it was defrauding such insurance companies as Saint Lukes Hospital had no legal right to recover for such service and instead had a legal obligation to inform the insurance companies it had ceased to have a right to bill the professional and production components of the fees for the services rendered at the emergency room on account of the clear terms of its agreement with PRMEG.

4.21    While the contract specified that it should conclude, absent action by Saint Lukes Hospital, on September 24, 2010, Saint Lukes continued using the services of PRMEG, pursuant to the contract until it recently notified the cancellation of the contract, effective on May 2, 2014.  Accordingly, PRMEG kept a contractual relationship with Saint Lukes Hospital from September 24, 2007 up to and including May 2, 2014.

4.22    Pursuant to the contract between PRMEG and Saint Lukes Hospital, PRMEG would manage and provide medical coverage for the Saint Lukes Hospital Emergency Room at its own cost and risk.  In compensation for this service, Saint Lukes Hospital agreed to pay PRMEG pursuant to the terms included in the 23rd clause of the contract.

4.23    PRMEG never consented or agreed to any change or amendment to the contractual agreement and no contract amendment was ever signed by PRMEG.

4.24    At all times PRMEG fully complied with all the services required by the contract.  However, as will be explained PRMEG was never fully compensated as agreed in the contract.

4.25    On the contrary, since early in the contractual relationship Saint Lukes Hospital deviated from the agreed terms of the agreement and contrary to its contractual obligations and the implied covenant of good faith, commenced a series of actions, in conjunction with Servicios de Salud, directed at depriving PRMEG of full extent of the agreed contractual compensation.

4.26    Unbeknown to PRMEG, at that time, Hospital and Servicios de Salud implemented a series of actions solely directed at enriching the RICO defendant at the expense of PRMEG.  At the same time they implemented a series of breaches of contract directed at pressuring PRMEG to amend or cancel its contract with Saint Lukes Hospital in order to create the appearance that the events that are described hereafter were consented and/or agreed to by PRMEG.

4.27    Pursuant to the clear terms of the agreement and in consideration for the services provided by PRMEG, Saint Lukes Hospital agreed to pay PRMEG during the

first three months of the contract the monthly sum of $155,000.00 and thereafter $133,000.00. In addition to the monthly payment, PRMEG had the right to directly bill insurance companies the professional service component of all services PRMEG provided to any and all patients who visited the Saint Lukes Hospital Emergency Room. To do this PRMEG had obtained from each of its contracted physicians a written consent known by CMS and Medicare as the "reassignment of benefit" that enable PRMEG to bill for the services provided by each of its contracted physicians who provided services in the Saint Lukes Hospital Emergency Room.

4.28   On the contrary, Saint Lukes Hospital never obtained any reassignment of benefit consent or any other valid type of consent from PRMEG to bill MCS authorized Medicare insurance carriers for PRMEG's services.

4.29   Trusting the contractual representations made by Saint Lukes Hospital in the contract, PRMEG dedicated its full resources and experience to developing the administrative infrastructure necessary to provide the most qualified services to Saint Lukes Hospital and at the same time bill for these services to different insurance companies.  At all times, PRMEG trusted Saint Lukes Hospital and Servicios de Salud representations without any limitation.

4.30   Pursuant to the contractual agreement, Saint Lukes Hospital had the contractual requirement to notify each of the insurance carriers that did business with the Hospital of the fact that PRMEG had retained the right to bill the professional component of the services it rendered at the hospital and to notify PRMEG of any ongoing or upcoming negotiations with any insurance company to allow PRMEG to

participate in such negotiations to expedite and facilitate the billing of PRMEG services to each such insurer.

4.31   The contract stated in the pertinent portion: "HESL agree that at the expiration of its agreements with each Medical Insurance Companies, HESL will include the Corporation (PRMEG) in any and all renewal negotiations with the Medical Insurance Companies, HESL consents and will specifically allow the Corporation to negotiate terms that will terminate the current per diem or all-inclusive arrangements and will enable the Corporation to thereafter directly bill the Medical Insurance Companies for all professional services provided to HESL's patients who receive medical treatment at the Emergency Department."

4.32   Notwithstanding the above, Saint Lukes Hospital never complied with the agreements in the contract and never invited nor allowed PRMEG to participate in any of the meetings with the insurance companies.

4.33   In fact, the aforementioned negotiations and meetings with different insurance companies were carried out by Servicio de Salud and not Saint Lukes Hospital.

4.34   After Saint Lukes Hospital entered into the professional service contract with PRMEG, Servicios de Salud negotiated and signed multiple new agreements or amended agreements with insurance carriers including a *per diem* and/or *all-inclusive* arrangement by way of false and fraudulent misrepresentations to the insurance carriers that Saint Lukes Hospital and Servicios de Salud could in fact bill the insurance companies for the professional services rendered by PRMEG in the emergency rooms property of the defendants.

**B.**     **Defendants' fraudulent dealings with the insurance companies.**

4.35    Among the various contracts that Servicios de Salud negotiated or renegotiated with the insurance companies are the following:

1. MCS

4.36    MCS maintained a master services agreement with  Saint Lukes Hospital since at least 2001 that was renewed and revised on or about October of 2005 and subsequently in January of 2007. Pursuant to all those master agreements, MCS would pay Saint Lukes Hospital for emergency room patients on a per diem or all-inclusive basis.

4.37    On January 2, 2008, only a few months after executing the agreement with PRMEG, Mrs. Ivette Segarra Román, Director for Servicios de Salud Episcopales, acting on behalf of Saint Lukes Hospital, sent a letter by ordinary mail to MCS stating that the contract between  Saint Lukes Hospital and MCS had expired and submitting a proposal for the various fees for services, which contemplated a per diem arrangement for the services provided in Saint Lukes emergency room to be included in each of the various  coverages, to wit, MCS Classicare, MCS PPO, MCS EPO and MCS Reforma.

4.38    On June 23, 2008 MCS responded via ordinary mail with a letter to Jaime Rivera, Vice-President and CFO of Servicios de Salud Episcopales, agreeing to charge a per diem fee for services rendered in Saint Lukes emergency room, across all of its medical insurance programs, albeit proposing a lesser per diem amount. Servicos de Salud Episcopales accepted MCS's proposal.

4.39    Accordingly, on or about July 1, 2008 Saint Lukes enters into various contractual agreements with MCS to include a per diem rate for all services rendered in

Saint Lukes emergency room, including the medical evaluation performed by PREMG retained physicians. These agreements include MCS Classicare, MCS, exclusive Provider Organization (EPO), MCS Preferred Provider Organization (PPO) and MCS Health Management Organization (HMO). On August 7, 2008, Servicios de Salud Episcopales, making use of the wirelines, sent by Fax its acceptance of the per diem rate proposed by MCS.

4.40   On or about December 14, 2009 MCS, using the mails, sent to Servicios de Salud Episcopales a new proposal to negotiate the financial terms of their agreement. The letter reflect that a meeting was held to negotiate this conditions on December 10, 2009. Using the emails and U.S. mails Servicios de Salud Episcopales accepted the proposal on December 18, 2009, which also included a per diem rate or all services rendered in Saint Lukes emergency room, including the medical evaluation performed by PREMG retained physicians.

4.41   The per diem contractual arrangement for services rendered to patients at Saint Lukes emergency room continued in full force and effect until 2014.

2. MAPFRE

4.42   On or about January 18, 2005, Saint Lukes Hospital and MAPFRE executed a contract o, which, among other matters, provided that all visits to the Emergency Room would be paid on a per diem basis. The contract established that it would be in effect for one (1) year and that it would be automatically renewed on a yearly basis under the same terms and conditions.  Saint Lukes Hospital never entered into a different contract with MAPFRE.

4.43    Instead, Co-Defendant Servicios de Salud Episcopales periodically renegotiated the fees for services provided to patients at the Hospital. In all those fee revisions, the services rendered to patients at the Emergency Room were maintained on a per diem basis. The only modification was in the per diem amount.

4.44    Those fee revisions occurred on or about April 1, 2008, February 2, 2010, November 8, 2010, June 6, 2012, and April 4, 2014. In each of those dates, the CEO of Servicios de Salud Episcopales executed the fee schedule that would be in effect with MAPFRE during the relevant period.

4.45    The fee schedules were negotiated by fax or e-mail. Once executed, the new fee schedules were transmitted either by fax or e-mail. Specifically, a fax transmittal occurred on April 1, 2008 and e-mails were made sent, among other dates, on July 12, 2010, March 2, 2012 and April 2, 2012 pertaining to the negotiation and acceptance of the fee schedules between Saint Lukes Hospital and MAPFRE, all of which provided for payment for services rendered at the Hospital's emergency room on a per diem basis.

### 3. Triple C

4.46    On or about May 28, 2008, Triple C sent by certified mail to Saint Lukes Hospital the written contract with the negotiated terms for the provision of services by Saint Lukes Hospital on May 28, 2008. This contract was signed by Saint Lukes on December 4, 2007, just a couple of months after retaining PRMEG to provide services in the  Saint Lukes Hospital Emergency Room.  In Article 7 of the contract Triple C and Saint Lukes agreed that all visits to the Emergency Room by covered patients would be compensated to Saint Lukes Hospital on a per diem basis of $89.00 per patient visit.

4.47   On a date prior to September 2013 Triple S executed an agreement with Saint Lukes Hospital to cover Mi Salud patients.   Under the terms of this agreement (Section 3.2) the emergency room services, including medical evaluation, are covered by a per diem agreement.

4.48   The specifics of the compensation are contained in a mailed letter of September 20, 2013 detailing the applicable per diem which was countersigned by Mr. Pedro Bares and returned by email to Triple SSS by Saint Lukes Hospital.

4. Panamerican Life Insurance Co. ("PALIC")

4.49   On or about April 14, 2010, Mrs. Ana M. Maldonado, an employee of Servicios de Salud Episcopales confirmed in writing to Mrs. Wilma Fernández, PALIC Provider Manager, that after consulting with Mr. Jaime Rivera and Guillermo Martin, it had been agreed that the corporation that provided medical services to Saint Lukes Hospital in the emergency room would bill procedures, as sutures. The letter further stated that the rest of the medical services, including the evaluation and treatment of patients, would be paid to the Hospital as part of a per diem rate.

4.50   On or about April 27, 2010, PALIC sent a letter to Mr. Jaime Rivera, CFO for Saint Lukes, with a contract effective September 1, 2009.  In the letter, Mrs. Wilma Rivera conveyed to Saint Lukes Hospital that as per its request PALIC was removing from the per diem rate for Emergency Room services the review of EKG tests and surgical procedures. The contract provided for a per diem rate of $160.00 to include the rest of the medical services rendered in the emergency room.

4.51   On or about December 10, 2010, Saint Lukes Hospital and PALIC signed an amended contract, effective on November 1, 2010. The amended contract

maintained the per diem arrangement that included the medical services provided to patients and the Hospital's emergency room.

4.52   On or about June 20, 2012, effective July 1, 2012, Saint Lukes Hospital and PALIC again amended their contract, this time further clarifying that the emergency room services were covered by an "all inclusive" fee that included the professional services rendered by physicians.

**C.   The cover-up and its discovery.**

4.53   By creating a complex scheme of various corporations the defendants were able to hide from PRMEG the fact that Saint Lukes had transferred all billing responsibilities under the contracts for services in the hospital to Servicios de Salud and that, contrary to the contractual agreement, Servicios de Salud was billing the insurance companies, through another corporation, Servicios Generales Episcolaes, Inc., for the same services that PRMEG was entitled to bill under both the contract, as well as Medicare law and CMS regulations.

4.54   Taking advantage of the fact that the original term of the contract between Saint Lukes and PRMEG had elapsed and that it was continuing month by month, the corporate defendants commenced a series of actions directed at obtaining essential business information from PRMEG under the veil of "negotiating" a new contract.

4.55   Pursuant to this, Messrs. Pedro F. Barez Clavel and Julio Colón Ruiz, acting as officers of Saint Lukes Hospital and Servicios de Salud, required from PRMEG detailed business and financial information concerning the physicians that were contracted by PRMEG, how much they were paid, administrative costs related to PRMEG management of the emergency room and PRMEG's cost structure.

4.56   In addition to the above, under the guise that they were considering a new contract for PRMEG, the defendants continued to delay the notification to the insurance companies that Saint Lukes Hospital had agreed with PRMEG for the latter to directly bill their professional services to the individual insurance companies that provide coverage for the patients of the Saint Lukes Emergency Room.

4.57   To the surprise of PRMEG, as of January 2014, after more than 7 years of uninterrupted contracted services with Saint Lukes Hospital, PRMEG learned that, Saint Lukes Hospital and Servicios de Salud had not even begun to initiate conversations to terminate their old *per diem* and *all inclusive* arrangements with most of the insurance providers in Puerto Rico.

4.58   PRMEG discovered this fact when, upon many requests from PRMEG, Barez finally provided, on January 14, 2014, a list of the contract status between Saint Lukes Hospital and the insurance companies.

4.59   Upon receipt of the January letter, the directors of PRMEG confronted Mr. Barez regarding the surprising number of *per diem* and *all inclusive* arrangements in violation of the contract. To their surprise and appall, Barez responded that it was with the moneys obtained through these agreements that the hospital was paying PRMEG for its services.

4.60   A series of meetings and letters ensued, where the hospital, for the first time, insisted that PRMEG had to cease the billing to the various insurance companies for its services as agreed in the contract.  When PRMEG refused to do so and when PRMEG informed the defendants that it understood that Saint Lukes Hospital was not only breaching its contract with PRMEG, but also violating federal law and applicable

regulation, Barez and Saint Lukes Hospital countered cancelling the contract effective May 2, 2014.

**D.** **MCS Claims.**

4.61   At the same time PRMEG was negotiating the renewal of its contract with Saint Lukes Hospital, an insurance carrier and Medicare administrator, Medical Card System Corp. (hereinafter "MCS"), had commenced a formal requirement for repayment of amounts of money allegedly overcharged by PRMEG.

4.62   MCS had previously required repayment from PRMEG for payments made on account of Medicare covered benefits that MCS claimed it has paid to Saint Lukes Hospital.   However, on those prior occasions and in good faith, once PRMEG established that it was contractually authorize to bill for its services to MCS covered patients in Saint Lukes Hospital emergency room, MCS had agreed not to continue the process of recovery.

4.63   That changed late in the year 2013 when in the midst of the negotiations with PRMEG and Saint Lukes Hospital it issued a claim letter against PRMEG purportedly invalidating the prior agreements and claiming from PRMEG over $600,000.00 in prior payments made on account of services rendered to MCS covered patients.

4.64   MCS claims against PRMEG was exclusively focused on the allegation that MCS had an ongoing *per diem* and/or all-inclusive agreement with Saint Lukes Hospital and that pursuant to such agreement it had paid the services provided by PRMEG to Saint Lukes Hospital for which PRMEG had to reimburse or return the payments made to it.

4.65    Several meetings ensued with MCS, Saint Lukes Hospital, Servicios de Salud and PRMEG officials. During the last meeting it became obvious, that the named defendants had continued to maintain, in clear disregard with the contractual obligations with PRMEG, the *per diem* and/or all-inclusive agreements with MCS and that such agreements covered PRMEG services in the emergency room.

4.66    During the last meeting, Mr. Barez in fact admitted to all present that he had recently concluded the negotiations for excluding the *per diem* and/or all inclusive as to MCS commercial type medical insurance but that all MCS medicare covered insured continued to operate under the same *per diem* and/or all inclusive agreement that existed in 2007 and that was amended several time thereafter.

4.67    At the meeting PRMEG countered that it also has a valid provider agreement with MCS, that it provided all services that were billed and that it has never authorize Saint Lukes Hospital to bill for its services nor has executed a reassignment of benefit in favor of Saint Lukes Hospital and that all of its physicians had reassign their right to Medicare fees to PRMEG for which all of PRMEG was correct as a matter of law and any overpayment was the responsibility of Saint Lukes Hospital.

4.68    At present MCS continues to claim to PRMEG the payment of over $600,000.00 of properly billed the fees for professional component services provided to Medicare covered MCS insured patients as a sole result of defendant's actions and omissions in breach of contract in this case.

### E.    **Saint Lukes Reduces PRMEG's Compensation.**

4.69    Not satisfied with the fact that Saint Lukes Hospital was billing insurance companies for services that belonged to PRMEG, Messrs. Barez and Colón agreed to

further breach Saint Lukes Hospital's contract with PRMEG by unilaterally reducing the agreed monthly payment to PRMEG.

4.70   The first such reduction occurred without PRMEG consent when in October 2011 the agreed monthly compensation was reduced to $120,000.00.

4.71   No reason or valid motive was advanced by Saint Lukes Hospital prior to enforcing the reduction. No amendment agreement was ever signed containing PRMEG's consent to this reduction that caused PRMEG hundred of thousand of dollars in losses and damages.

4.72   Again, not satisfied with breaching the agreement as to the billing portions of the contract and with reducing the monthly compensation, Saint Lukes Hospital again notified a further unilateral reduction without the consent of PRMEG on November 2012. This second reduction reduced PRMEG's monthly compensation to $105,000.00.

4.73   At the same time Saint Lukes Hospital was reducing PRMEG compensation for the operations of its Emergency Room, the defendants notified PRMEG that it was unilaterally reducing another of PRMEG's contracts, this one for the operation of the emergency room in the El Tuque treatment facility operated by Saint Lukes Hospital. While PRMEG contract with Saint Lukes Hospital regarding the operation of El Tuque Emergency Room called for the hospital to pay PRMEG a monthly fee of $52,000.00, the defendants unilaterally determined to reduce the compensation to $48,000.00 in November of 2010.

4.74   The multiple unilateral reductions in the agreed payments to PRMEG seriously reduced the monthly compensation that PRMEG had agreed to receive in

exchange for its services. The loss of a significant portion of the agreed monthly payment caused significant damages and losses to PRMEG.

**F.    Saint Lukes Hospital Forces PRMEG to Increase Medical Coverage, but Fails to Compensate PREMG for those Additional Services.**

4.75   At the same time that the defendants were reducing the monthly payments to PRMEG and interfering with PRMEG contractual and legal right to bill for its services, Messrs. Barez and Colón unilaterally agreed to order PRMEG to increase the number of shifts covered by board certified emergency room physicians.  Up until the time of the change, PRMEG was contractually bound to provide a certain number of shifts to be covered by general physicians and other shifts covered by emergency room physicians. Defendants unilaterally increased PRMEG services without providing any compensation.

4.76   With the forced change to the terms of service, PRMEG was forced to retain additional emergency room physicians to cover such shifts but was never compensated accordingly.  This change was never included in any contract amendment nor agreed to by PRMEG. The defendants refused at all time to properly compensate PRMEG for these additional services not included in the original contract with Saint Lukes Hospital causing serious economic harm to PRMEG.

4.77   Further to this pattern of unilateral changes and breaches of its contract with PRMEG, defendants later notified PRMEG of its determination to create an "overlapping" shift that in essence created an additional shift that PRMEG was required to cover. Again, this change was not agreed to or consented by PRMEG nor any amended contract was signed. Saint Lukes Hospital refused at all time to properly

compensate PRMEG for this additional services not included in the original contract with Saint Lukes Hospital causing serious economic harm to PRMEG.

**G.    Defendants interfere with PRMEG's relationship with its contracted physicians providing false information to PRMEG contracted physicians.**

4.78    Defendants used the confidential business information provided in good faith by PRMEG for the so called "negotiations" to take over, copy and use for the sole benefit of the defendants, PRMEG's business model and to be able to promptly and effectively interfere with the contracts that PRMEG had with its services providers who for many years had provided contractual services to PRMEG.

4.79    With the information provided by PRMEG, Defendant's employees and officers including but not limited to Pedro Barez, Colón and other Saint Lukes Hospital employees contacted PRMEG's contracted physicians first to offer false, misleading and libelous information concerning PRMEG finances and its ability to continue using their services and second to offer a very similar compensation arrangement of the kind that PRMEG had provided to each such physicians.

4.80    Defendants' employees contacted and pressured PRMEG's contractors in violating their existing contracts with PRMEG and directed them to refuse any work offer made by PRMEG.

4.81    In so acting the defendants, were effective in interfering with the contracts of most of the physicians who used to provide services to plaintiff in the Saint Lukes Hospital's facilities.

4.82    The defendants obtained the necessary information concerning the economic value of the services contracts between PRMEG and its physicians by pressuring PRMEG to divulge this privileged and confidential information arguing that it

was necessary to evaluate the renewal of the contract when the corporate defendants knew that PRMEG would not continue to offer services to Saint Lukes Hospital.

4.83    As a result of the tortious and bad faith conduct described above, PRMEG has lost access to an important group of physicians that it had carefully assembled to provide emergency room services, notwithstanding the fact that PRMEG has other medical facilities available where this carefully chosen and trained physicians could had continued providing services to PRMEG.  The loss of this talent list by PRMEG certainly creates significant losses and damages to PRMEG due to the limited access to comparably trained and educated physicians in the Puerto Rico market.

## V.  OVERVIEW OF DEFENDANT IGLESIA PATTERN OF FRAUDULENT CONDUCT AND RACKETERRING ACTIVITY

**A.    <u>Introduction.</u>**

5.1    Plaintiff brings this action under the Racketeering Influence and Corrupt Organization Act and other law against the named defendants. The basis of this action revolves around a scheme of fraudulent conduct that the conspiring defendants engaged in through various enterprises as a result of their acts taken in furtherance of the fraudulent scheme.

5.2    As a consequence of their enterprise and conspiratorial actions, as will be detailed, the RICO Defendant violated the RICO Act, both directly and through the corrupt enterprise violating numerous federal laws and regulations by falsely represented to insurance companies that the enterprise defendants were legally entitled to bill for the services provided by PRMEG well knowing that such representation were false, thus, fraudulently obtaining millions of dollars in payments from insurance companies for services rendered by PRMEG when such moneys properly belonged to

PRMEG. Furthermore, the RICO Defendant fraudulently conspired to deprive PRMEG of its ability to directly bill for all its services as per the contract signed by asking insurance companies to include the professional component of PRMEG services to patients within a *per diem* and/or *all inclusive* agreement with insurance companies well knowing and in particular with regards to Medicare covered services that PRMEG had never agreed to reassign such professional component rendered by plaintiff to the defendants for the billing of such services by the defendants.

5.3    By defrauding and overbilling the insurance companies for the professional service component of the services provided by PRMEG, either directly or through a *per diem* and/or *all inclusive* arrangements the corrupt enterprise defendants, Saint Lukes Hospital and Servicios de Salud Episcopal were unjustly enriched, which in turn caused severe and on-going economic damages to plaintiff's business operations and financial infrastructure; and severely tarnished plaintiff's business reputation.  The scheme to defraud also caused millions of dollars of losses to insurance companies in Puerto Rico, some of which are related to Medicare or Medicaid covered services.

5.4    By information and belief it is alleged that at some point in time corporate directors for the corporate defendants for the RICO Enterprise and officials for Iglesia, who in turn were members of the Board of Directors of the RICO Enterprise met to discuss how they could channel corporate funds to the Iglesia's bank accounts.

5.5    During those meetings it was agreed that moneys possessed by Saint Lukes Hospital and/or Servicios de Salud in excess of 50 Million Dollars were to be diverted to Iglesia to use such funds for the benefit of Iglesia and its projects.

5.6    It was furthered agreed that the corporate defendants would create a kind of monthly contribution to Iglesia in order for the corporate defendants not to have, as before, significant cash deposited on their names and to further enrich Iglesia.  This monthly payment was coordinated through Iglesia's officers and Servicio de Salud's officers and was implemented every month without taking into consideration the financial operation of Saint Lukes Hospital.

5.7    The purpose of channeling funds from the corporate defendants to the RICO defendant was to also provide direct moneys to Iglesia's then directors to cover their living expenses, to purchase property and assets for their individual benefit and to cover payments for loans taken by Iglesia.

5.8    By information and belief it is alleged that in few years Iglesia spent the significant amount of moneys transferred from the corporate defendants to Iglesia and continued to require increasingly larger monthly sums to cover Iglesia's expenses, particularly for the living arrangements of Iglesia's directors.

5.9    Saint Lukes Hospital, however, had increased operational costs associated with the difficult financial situation in Puerto Rico for which the individual defendants, on behalf of Iglesia, needed to corrupt Saint Lukes Hospital and Servicios de Salud to improperly bill millions of dollars to insurance companies for services rendered by PRMEG when they well knew such services belonged to PRMEG and could not properly be billed by the corrupted enterprises.

5.10   In so doing, the corrupted enterprises was able to maintain the necessary cash flow to provide Iglesia with the required monthly payments while at the same time covering Saint Lukes Hospital operational expenses.

5.11   The RICO defendant was able to corrupt the RICO Enterprise corporations as it held control, through the head of the church, of each of the RICO Enterprises corporations' board of directors.   Through the RICO Defendant absolute control of the RICO Enterprise, Iglesia was able to enact and further the scheme to defraud and thus obtain for its benefit million of dollars to which it was not entitled as a matter of law.

**B.**   **The Scheme**.

5.12   Prior to the signing of the contract with PRMEG Saint Lukes Hospital used a "flat fee" arrangement with prior emergency room service providers.   Under the "flat fee" arrangement the corporation that managed the emergency room did not bill any of its services, thus assigning such right to the hospital.

5.13   Under the new arrangement signed with PRMEG the hospital did not receive any assignment of benefits from PRMEG in exchange for paying a substantially reduced monthly rate to PRMEG.   PRMEG in turn, retained its legal right to bill for the professional component of its services to insurance companies.   Thus, PRMEG assumed the risk of payment for the professional component of its services and the Hospital limited its monthly expenditure for the administration and management of the emergency room.

5.14   Having determined that allowing PRMEG to bill for the professional component of the services would impact Saint Lukes Hospital's and Servicios de Salud's finances, in turn affecting their capacity to fulfill the monetary demands of the RICO defendant, the corrupted enterprises, decided to embark in a course of deception, deceit, bad faith false representations and fraud to keep both the lower monthly

compensation agreed with PRMEG, as well as the higher income produced by billing to insurance companies the professional component to which PRMEG was entitled to.

5.15   To further the racketeering and fraudulent intent it is alleged that by information and belief Iglesia, used a series of corporations herein jointly named as the RICO Enterprise in order to promote and advance the fraudulent objectives of billing for the services that were provided by PRMEG, well knowing that it was not legally entitled to bill such services.

5.16   Thus, Iglesia used the corporate defendants to represent to the different insurance providers, including various delegated Medicare and Medicaid recipients that Saint Lukes Hospital had engaged the services of Servicios de Salud Episcopal to manage its operations.   In turn Servicio de Salud Episcopales represented to the insurance companies that all services provided by Saint Lukes Hospital, a non-for profit, would be billed by Servicios Generales, another corporation controlled by Iglesia.   As such the providers numbers fraudulently used to improperly bill and ultimately enrich Iglesia belonged to Saint Lukes Hospital, but were managed by Servicios de Salud Episcopal and billed through Servicios Generales.

5.17   As the scheme to defraud goes, the RICO Defendant used Saint Lukes Hospital to retain PRMEG to provide services to its patients in the Emergency Room and later in El Tuque Emergency Room and to falsely represent to PRMEG that it would renounce all *per diem* and/or *all inclusive* arrangements with the insurance companies and Medicare and Medicaid recipients when in truth it had no intention of doing so.   The RICO enterprise then continued to falsely represent to PRMEG that there was no issue that prevented PRMEG from directly billing the professional component of its services

when it wholly knew that it was continuing to bill such component to the same insurance companies, thus concealing from PRMEG the scheme to defraud and the damages caused to Plaintiff.

5.18   At the same this occurred Saint Lukes Hospital delegated the negotiations of its contracts with insurer providers to another part of the RICO enterprise, Servicios de Salud and assigned to it a substantial part of its income.  The RICO enterprise then fraudulently conveyed to the insurance companies, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.19   By information and/or belief on or around May 1, 2009 the RICO enterprise fraudulently conveyed to the Insurance company First Plus, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.20   By information and/or belief on or around July 1, 2012 the RICO enterprise fraudulently conveyed to the insurance company Humana Health also known as Humana Insurance, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance

company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.21   By information and/or belief on or around September 1, 2012 the RICO enterprise fraudulently conveyed to the insurance company Humana operating the public welfare health program ("Mi Salud") through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.22   By information and/or belief on or around October 1, 2010 the RICO enterprise fraudulently conveyed to the insurance company International Medical Card, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.23   By information and/or belief on or around February 1, 2012 the RICO enterprise fraudulently conveyed to the insurance company Mapfre, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but

failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.24   By information and/or belief on or around December 1, 2009 the RICO enterprise fraudulently conveyed to the insurance company MCS Classicare, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.25   By information and/or belief on or around July 1, 2013 the RICO enterprise fraudulently conveyed to the insurance company Preferred Medical Choice, known as "Medicare y Mucho Mas" through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.26   By information and/or belief on or around July 12, 2012 the RICO enterprise fraudulently conveyed to the insurance company Pan American Life, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had

retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.27   By information and/or belief on or around July 1, 2013 the RICO enterprise fraudulently conveyed to the insurance company Plan Menonita, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.28   By information and/or belief on or around October 1, 2012 the RICO enterprise fraudulently conveyed to the insurance company Prossam, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.29   By information and/or belief on or around May 1, 2012 the RICO enterprise fraudulently conveyed to the insurance company Triple SSS, through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.30   By information and/or belief on or around October 1, 2013 the RICO enterprise fraudulently conveyed to the insurance company Triple SSS, operating the public welfare health program ("Mi Salud"), through the use of the mails and wires, that Saint Lukes Hospital was legally able to provide a *per diem* and/or *all inclusive* arrangement to the insurance company as it had done before, but failed to inform in bad faith and with gross disregard to the truth that it had retained PRMEG to manage its emergency room and El Tuque emergency room allowing PRMEG to directly bill for the professional component of its services.

5.31   To further the fraud and conceal the products of the scheme, the RICO Defendant created a new corporation named Servicios Generales Episcopales, Inc., whose main objective was to bill the services provided by Saint Lukes Hospital, including the professional component of the services provided by PRMEG.  To be able to consummate this scheme to defraud, to bill services not actually provided by Saint Lukes Hospital, but by PRMEG, from 2007 and through 2014 the RICO enterprise used the mail and wires to electronically invoice the insurance companies, on at least a monthly basis, for monies to which the enterprise was not entitled because they belonged to PRMEG and in exchange received numerous payments either through wire or through the use of the United States Mail.

5.32   Each and every months from the signing of the contract with PRMEG Servicios de Salud and Servicios Generales caused the use of the wires to transmit fraudulent and false information to the aforementioned insurance companies and/or health plans falsely representing that Saint Lukes Hospital had provided certain medical services to covered patients when in fact such services were provided by PRMEG.

5.33    On a monthly basis or more frequent Servicios de Salud and Servicios Generales caused the use of the wires to provide the aforementioned insurance companies a detail of claims not paid by such companies well knowing that these claims falsely represented that Saint Lukes Hospital had provided certain medical services to covered patients when in fact such services were provided by PRMEG.

5.34    On a monthly basis or more frequent Servicios de Salud and Servicios Generales caused the use of the wires or mails by the aforementioned insurance companies that notified by mail the approved and rejected false claims submitted by the RICO Enterprise and used the wires and/or mails to forward the payment to the RICO Enterprise for the fraudulently claimed services, thus furthering and advancing the scheme to defraud.

5.35    Exhibits 1, 2 and 3 attached hereto and incorporated by reference provide the details of all the instances that PRMEG has identified to date in which Servicios de Salud Episcopales submitted invoices by e-mail to MCS, PALIC and MAPFRE for services rendered to patients at  Saint Lukes Hospital emergency room on a per diem basis, including the medical or professional component that only PRMEG was entitled to bill as per the contract executed between PRMEG and  Saint Lukes Hospital and the new business model that said contract established.

5.36    Similar and numerous other invoices were submitted by Servicios de Salud Episcopales to all other insurance companies from 2007 thru 2014 in dates that PRMEG has not yet been able to identify in light of the limited discovery that has been conducted to date.

5.37    It draws from the above that the Iglesia used and corrupted for its illegal purposes Saint Lukes Hospital, Servicios de Salud and Servicios Generales, as the enterprise used to effect the fraudulent scheme describe above.

5.38    Most if not all insurance providers received Federal Funds covered by Medicare and Medicaid funds for which the scheme to defraud affected interstate commerce as described above.

## VI.  FIRST CAUSE OF ACTION
## (RICO ACT SECTIONS 1962(B)-(C) SOLELY AGAINST THE RICO DEFENDANT)

6.1    The allegations contained in all preceding paragraphs are realleged as if fully alleged herein.

6.2    Plaintiff is a person within the meaning of 18 U.S.C. §1961(3).

6.3    Iglesia, the RICO Defendant is also a person within the meaning of 18 U.S.C. §1961(3).

**A.    The RICO Enterprise**

6.4    The RICO Defendant is a Puerto Rico Corporation who corrupted a group of Puerto Rico corporations it controls for the common purpose of carrying out an ongoing criminal enterprise, as described in the Complaint.

6.5     Saint Lukes Hospital, Servicios Episcopales and Servicios Generales are the enterprise, as that term is defined in 18 U.S.C. §1961(4) for the purpose defrauding multiple insurance companies and thus causing damages to plaintiff as part of the racketeering scheme.   These corporations form an enterprise which engages in and whose activities affect, interstate commerce.

**B.    Pattern of Racketeering Activity:   Mail and Wire Fraud in violation of 18 U.S.C. §§ 1341 and 1343**

6.6     As described above, the RICO defendant engaged in a scheme to defraud plaintiff and victim insurance companies in Puerto Rico and elsewhere.   The ultimate objective of the RICO defendant's scheme was to maintain and/or grow the amount of money available for Iglesia to withdraw from the corrupted enterprise corporations by way of the criminal activity described herein.

6.7     In furtherance of this scheme, the RICO defendant, through the corrupt enterprise, transmitted or caused to be transmitted, by means of wire communication in interstate commerce, writings, moneys, signs, signals, pictures or sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including but not limited to, the following:

- False and misleading information to the plaintiff and the insurance companies by falsely representing that it could bill for the services provided by PRMEG;

- Fraudulent invoices to insurance companies by billing a *per diem* and/or *all-inclusive* fee that included the professional component of the services provided by PRMEG when it had contractually agreed that PRMEG was the entity entitled to bill, as it did, such services to the insurance company thus defrauding plaintiff and the insurance companies and unjustly enriching with the proceeds of the wrongly billed amounts;

- Emails incorporating the aforementioned false and misleading statements between the RICO corrupted enterprise and the insurance companies victims of the scheme to defraud;

- Mailings or wirings with the fraudulently acquired moneys from the insurance companies to the RICO Enterprise corporations; and

- Writings and/or mailings or emails between the RICO defendant and the corrupted RICO enterprise regarding the transmittal of moneys from the corrupted enterprise defendants to the RICO defendant.

6.8    Pursuant to and in furtherance of the fraudulent scheme, Iglesia, through the use of the corrupt enterprise, committed multiple acts of conduct intent on defrauding plaintiff and insurance companies, affecting interstate commerce, through, without limitation:

- Various interstate communications via email, wire and/or phone: supplying to the insurance companies multiple communications of their alleged false entitlement to bill for the professional component of PRMEG services notwithstanding what was agreed in the contract;

- Various interstate communications via email, wire and/or phone: fraudulently concealing to the insurance companies the contractual relationship between PRMEG and Saint Lukes Hospital;

- Various interstate communications via email, wire and/or phone with PRMEG directors to further the concealment portion of the conspiracy to defraud by providing false, incomplete and inaccurate information to PRMEG directed at false representing that Saint Lukes Hospital was complying with its contractual obligations and attempting to clarify with each insurance company that PREMG was the contractual entity with a right to bill the professional

component of the services rendered by PREMG when the contrary was happening:

- Various interstate communications via email, wire and/or phone: supplying to the insurance companies with fraudulent invoices and/or bills for services not rendered by Saint Lukes Hospital, but by PRMEG;

- Various interstate communications via email, wire and/or phone: supplying to the insurance companies with false and/or fraudulent information to convince the insurance companies to renew contractual agreements through which the defendants could continue and enlarge their scheme to defraud and collect moneys to which they were not entitled to.

6.9    These numerous acts that took place continuously from the year 2007 up to and including the year 2014 constitute a clear pattern of racketeering activity pursuant to U.S.C.A. §1961(5).

6.10   The RICO defendant participated in the scheme knowingly, willfully, and with the specific intent to deceive and defraud the Plaintiff, as well as the insurance companies.

6.11   Iglesia has directly or indirectly conducted and participated in the conduct of the enterprise affairs through a pattern of racketeering activity as described above in violation of 18 U.S.C. §1962(c).

6.12   The RICO Defendant is engaged and controls an enterprise whose activities affect interstate commerce, in violation of 18 U.S.C.A. §1962(b).  The RICO defendant has directly or indirectly acquired and maintained interest in and control of

the RICO enterprise through the pattern of racketeering activity described above, again in violation of 18 U.S.C.A. §1962(b).

6.13   Specifically the RICO enterprise corporations were corrupted by the RICO defendant with the goal of facilitating access to millions of dollars in fraudulent billings to insurance plans, including a significant amount to be derived from the fraudulent and racketeering conduct.

6.14   The RICO enterprise's false and misleading statements have been relied on by Plaintiffs and insurance companies.   Further these false and misleading statements, as well as the actions undertaken by the RICO defendant have caused plaintiff considerable damage.   These damages are estimated in an amount not less than $6,000,000.00. However, pursuant to 18 U.S.C. §1964 threefold the damages against the RICO Defendant are requested.

## VII. SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT AGAINST THE CORPORATE DEFENDANTS)

7.1   The allegations contained in all preceding paragraphs are realleged as if fully alleged herein.

7.2   Notwithstanding the clear terms of the contract, Saint Lukes Hospital and Servicios de Salud agreed to a course of conduct by way of deceiving the insurance companies into believing that PRMEG had assigned to Saint Lukes Hospital and Servicios de Salud its right to recover for the professional component of its services to patients at the Emergency Rooms owned by Saint Lukes Hospital and Servicios de Salud knowing well that such conduct constituted a clear breach of the contract with PRMEG.

7.3     At the same time and to further and maintain the fraud on the insurance companies these defendants failed to provide any notice or invitation to PRMEG to participate in the negotiations with the insurance companies to thereafter eliminate the *per diem* and/or *all-inclusive* agreements also in breach of the contract.

7.4     Further to the above, Saint Lukes Hospital arbitrarily and without the consent of PRMEG reduced the monthly compensation paid by Saint Lukes Hospital to PRMEG both for the services provided to Saint Lukes Hospital at its emergency room, as well as in the emergency room of the El Tuque Emergency Room.  This reduction in the monthly payments to PRMEG, which was never consented to or approved by PRMEG caused economic losses to PRMEG in an amount not less than $843,000.00.

7.5     The reduction in the agreed payments to PRMEG for its services constitute a late payment for which legal interest should be imposed on all due amounts from the moment such amounts were due and payable to PRMEG.  PRMEG estimates the amount prejudgment interest owed to PRMEG on account of the reduced payments to be not less than $100,000.00.

7.6     Saint Lukes Hospital also breached its contractual obligations with PRMEG by arbitrarily and without the consent of PRMEG required the latter to provide without any compensation further services.  Saint Lukes Hospital required PRMEG to provide additional board certified emergency room physicians which substantially increased the costs of operating the emergency room by PRMEG.  Further, Saint Lukes required PRMEG to create an overlapping shift with additional physicians also increasing the costs of operating the emergency room without any compensation. The estimated costs of the additional services provided by PRMEG that were never

compensated by Saint Lukes Hospital is conservatively estimated in an amount not less than $1,200,000.00.

7.7    In addition to the above, as a result of the defendants' scheme to defraud the insurance companies, in breach of the contract with PRMEG, PREMG was prevented from fully billing and recovering its services as permitted by the Contract with Saint Lukes Hospital.

7.8    Particularly several insurance companies never were willing to allow PRMEG to bill and recover for the services it provided to patients at Saint Lukes Hospital.  Saint Lukes Hospital and Servicios de Salud, however, were able to bill and recover such services, which were never paid to PRMEG.   Codefendant Servicios Generales also benefited from this breach and fraudulent scheme by receiving a percentage of the overbilling made to insurance companies.

7.9    PRMEG has a legal right to recover theses services illegally billed by Saint Lukes Hospital and Servicios de Salud and Servicios Generales, as damages for the breach of contract described herein.  PRMEG estimate that the amount of money that PREMG was not able to bill and recover due to Saint Lukes Servicios de Salud and Servicios Generales, breach of contract actions and omissions are estimated in an amount not less than 6,000,000.00.

## VIII.   THIRD CAUSE OF ACTION
## (BREACH OF IMPLIED COVENANT OF GOOD FAITH)

8.1.    Plaintiff realleges as if fully set forth herein the allegations contained in all preceding paragraphs.

8.2.    Pursuant to the executed contract between Saint Lukes Hospital and PRMEG, the Puerto Rico Civil Code and the Doctrine of the Implied Covenant of Good

Faith, Saint Lukes Hospital and Servicios de Salud had both a contractual and legal obligation to conduct themselves with good faith in all actions related to the execution of Saint Lukes Hospital contractual agreement with PRMEG.

8.3.    Given the above, Saint Lukes Hospital, Servicios de Salud and Servicios Generales, not only had to comply with the contractual requirement that they allow PRMEG to participate in the negotiations with the insurance companies for the conclusion of all *per diem* and/or *all inclusive* that affected PRMEG's right to directly bill and recover for the professional component of its services, but also had the good faith obligation to promptly inform PRMEG any situation that affected this contractual obligation.

8.4.    By materially breaching the contract with PRMEG and by deceiving both PRMEG and the insurance companies with the material misrepresentations described heretofore Saint Lukes Hospital, Servicios de Salud and and Servicios Generales, acted with clear disregard and in violation of the implied covenant of good faith that exist in all contractual relationships in Puerto Rico.

8.5.    For such actions, Saint Lukes Hospital, Servicios de Salud and Servicios Generales, are both jointly liable to PRMEG for all damages caused as a result of their violation of the implied covenant of good faith, including but not limited to the amounts that PRMEG was prevented from billing and recovering from multiple insurance companies.  These damages are estimated in an amount not less than 6,000,000.00.

## IX. FOURTH CAUSE OF ACTION
## (CONTRACTUAL FRAUD – "DOLO")

9.1    Plaintiff realleges as if fully set forth herein the allegations contained in all preceding paragraphs.

9.2    For the aforementioned facts the conduct exhibited by Saint Lukes Hospital, Servicios de Salud and Servicios Generales, constitute contractual fraud ("dolo") in the performance of the contract with PRMEG.

9.3    Given the above, both Saint Lukes Hospital, Servicios de Salud and Servicios Generales, are jointly responsible for the totality of all damages caused to PRMEG as a result of their actions, irrespective if such damages were foreseeable or not. Such damages are estimated in not less than 6,000.000.00.

## X. FIFTH CAUSE OF ACTION
### (UNJUST ENRICHMENT)

10.1    Plaintiff realleges as if fully set forth herein the allegations contained in all preceding paragraphs.

10.2    As a direct result of their acts and omissions as previously described, Saint Lukes Hospital, Servicios de Salud and Servicios Generales, were able to bill millions of dollars for services Saint Lukes Hospital did not provide or was not contractually authorized to bill and which payments belonged to PRMEG.  Equally, by unilaterally reducing the monthly compensation due to PRMEG and by increasing the services required from PRMEG without compensation, Saint Lukes Servicios de Salud and Servicios Generales, wrongfully and unjustly enriched themselves while impoverishing PRMEG.

10.3    The only reason why Saint Lukes Hospital, Servicios de Salud and Servicios Generales, did not properly and promptly act with regards to their contractual obligations with PRMEG was because they wanted to receive the economic benefits

derived from the fraudulent billing of the services that contractually and legally belonged to PRMEG.

10.4   Pursuant to the unjust enrichment doctrine, PRMEG has the right, in the alternative a contractual claim does not proceed, to be compensated for all the billing and moneys received illegally and unjustly by Saint Lukes Hospital, Servicios de Salud and Servicios Generales, that legally and contractually belonged to PRMEG.  This claim is valued in an amount not less than 6,000,000.  Equally, PRMEG is entitle to recover under this same doctrine for all the value of the reduced payments and increased services that were never compensated and through which Saint Lukes Hospital, Servicios de Salud and Servicios Generales, enriched themselves while impoverishing PRMEG. This claim is valued in an amount not less than 2,000,000.

## XI. SIXTH CAUSE OF ACTION
### (Declaratory Judgment)

11.1   Plaintiff realleges as if fully set forth herein the allegations contained in all preceding paragraphs.

11.2   At present PRMEG has a pending claim for recovery of moneys claimed by MCS for services rendered by PRMEG that MCS understands were paid to Saint Lukes Hospital, and/or Servicios de Salud pursuant to a negotiated *per diem* and/or all-inclusive agreement for emergency room services.

11.3   Such agreement was negotiated and renovated without the consent or even prior notification to PRMEG who had the contractual and legal right to bill insurance companies for its services to covered patients treated by its physicians in the Saint Lukes Hospital and El Tuque emergency room.

11.4    Other insurance companies have presented in the past and may present in the future similar claims that if effective will allow the insurance companies to deduct or recover the claimed amounts from future invoices sent by PRMEG for services rendered in other emergency rooms where it provides services.

11.5    Accordingly, it is respectfully requested that this Honorable Court issues declaratory judgment against the corporate defendants in this case to jointly respond and indemnify with payment to the insurance companies of any claims for overpayment resulting from the insurance company claiming that it overpaid PRMEG as a result of paying for the same services to any of the corporate defendants in this case.

11.6    Declaratory Judgment is also requested holding that both the applicable law, as well as the contract in this case barred the corporate defendants from billing for PRMEG's services to covered patients treated by its physicians in the Saint Lukes Hospital and El Tuque emergency room to all insurance companies and that the right to bill for such services was exclusive to PRMEG.

11.7    Declaratory Judgment is also requested holding that any billing by any of the corporate defendants for PRMEG's services to covered patients treated by its physicians in the Saint Lukes Hospital and El Tuque emergency room cannot be deemed to be equal as payment to PRMEG for which  the corporate defendants must be ordered to satisfy and pay the insurance companies and/or fully indemnify PRMEG from any obligation to pay any such sums to any insurance company for past, present or future claim arising out of the improper billing by the corporate defendants of PRMEG services to covered patients treated by its physicians in the Saint Lukes Hospital and El Tuque emergency room.

## XII.  SEVENTH CAUSE OF ACTION
## (TORTIOUS INTERFERENCE, BAD FAITH USE OF CONFIDENTIAL INFORMATION)

12.1    Plaintiff realleges as if fully set forth herein the allegations contained in all preceding paragraphs.

12.2    Barez, Colón on behalf of the corporate defendants including Saint Lukes Hospital used the confidential business information provided in good faith by PRMEG during the so called "negotiations" to take over, copy and use for the sole benefit of the defendants, PRMEG's business model and to be able to promptly and effectively interfere with the contracts that PRMEG had with its services providers who for many years had provided contractual services to PRMEG.

12.3    Barez, Colón and other Saint Lukes Hospital's employees contacted and pressured PRMEG's contractors in violating their existing contracts with PRMEG and directed them to refuse any work offer made by PRMEG.  In so acting, Barez, Colón on behalf of the corporate defendants, were interfering with the contracts of most of the physicians who used to provide services to plaintiff in the Saint Lukes Hospital's facilities.

12.4    As a result of the tortious and bad faith conduct described above, PRMEG has lost access to an important group of physicians that it had carefully assembled to provide emergency room services.

12.5    The Corporate Defendants benefited from the conduct of its employees and agents as described above for which they are jointly liable for the damages caused for these action to PRMEG.

12.6    The corporate defendants, through its agents and employees, acting with gross disregard to the truth and with the obvious intent to cause damages to PRMEG,

provided false and defamatory information to PRMEG's contracted employees by informing and/or implying to the them that the termination of Saint Lukes Hospital with PRMEG will cause the financial ruin of the latter and that PRMEG will not be able to comply with its contractual obligations with these physicians.

12.7  Furthermore, the corporate defendants, through its agents and employees, defamed the good corporate name of PRMEG by claiming that certain delays in payment to PRMEG contracted employees were caused by PRMEG's management problems when such individual defendants as well as the corporate defendants, well knew that the delay in payment and any related issue was solely caused by Saint Lukes Hospital habit of paying late the invoices sent for payment by PRMEG.

12.8  The corporate defendants are jointly liable to PRMEG for the damages caused to PREMG good name and good will in an amount not less than $500,000.00.

12.9  Furthermore, the corporate defendants are jointly liable to PRMEG for the damages caused to PREMG for its loss of access to multiple carefully selected contractors with which PRMEG had contracts that were tortuously interfered with by these defendants. The damages caused by the tortious interference alleged in this complaint is estimated in not less than $500,000.00.

## XIII. RELIEF

Wherefore, the Plaintiffs respectfully pray that this Honorable Court enter judgment providing the following relief:

1.  Award Plaintiff the economic and compensatory damages caused by Defendants.

2.      Award Plaintiff treble damages as required by RICO.

3.      Award Plaintiff the costs of the action, together with reasonable attorneys' fees; prejudgment interest and any other or further relief as the Court may deem appropriate and proper due to Defendants' obstinacy.

**WE HEREBY CERTIFY**: that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all the attorneys of record.

**RESPECTFULLY SUBMITTED**, in San Juan, Puerto Rico, on August 4, 2017.

*S/RAUL S. MARIANI FRANCO*
RAUL S. MARIANI FRANCO
USDC-PR NO.: 210309
P.O. BOX 9022864
SAN JUAN, PR 00902-2864
Tel.: (787) 620-0038/Fax: (787) 620-0039
marianifrancolaw@gmail.com

*S/GUILLERMO RAMOS LUIÑA*
GUILLERMO RAMOS LUIÑA
USDC-PR NO.: 204007
gramlui@yahoo.com
P. O. BOX 22763, UPR Station
SAN JUAN, PR 00931-2763
Tel. (787) 620-0527
Fax (787) 620-0039